UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:

Rhonda R. Rodgers,                                  Bankruptcy No. 03-32034
                                                    Chapter 7
    Debtor.
_____/

MWI Veterinary Supply Co.,

    Plaintiff,

vs.                                                 Adversary No. 04-7019

Rhonda R. Rodgers,

    Defendant.
_____/

**MEMORANDUM AND ORDER**

By Complaint filed March 5, 2004, Plaintiff MWI Veterinary Supply Co. initiated this adversary proceeding seeking determinations that Debtor/Defendant Rhonda R. Rodgers, is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2) and that an outstanding debt owed by the Debtor to MWI in the amount of $72,638.84 is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). By Answer filed November March 29, 2004, the Debtor denies the allegations.

The matter was tried before the Court on June 24, 2004. Another adversary proceeding initiated in another bankruptcy case, MWI Veterinary Supply Co. v. Jeffrey G. Rodgers, et. al, Adversary No. 03-7062, involves similar facts and issues, and was tried at the same time.[1] Upon

---

[1] A separate Order will be entered in MWI Veterinary Supply Co. v. Jeffrey G. Rodgers, Adversary No. 03-7062.

AO 72A
(Rev.8/82)

consideration of the Joint Statement of Uncontested Facts and the facts gleaned from trial, the following constitutes the Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

A.   The Divorce

The Debtor and Jeffrey G. Rodgers were married on October 18, 1992. The parties entered into a divorce stipulation on January 9, 2003, and a divorce judgment and decree was entered on February 25, 2003. The Debtor was given primary physical custody of their minor child, and neither of the Rodgers is obligated to pay alimony or spousal support to the other. Jeffrey Rodgers agreed to pay child support in the amount of $700.00, an upward deviation from the child support guideline amount of $508.00 per month based on his $2,600.00 net monthly income. Jeffrey Rodgers owned and operated a number of sole proprietorship veterinary businesses over the years, including, most recently, Animal Medical Center, which closed its doors on the same day as the first meeting of creditors, September 4, 2003.

The Debtor and Jeffrey Rodgers talked about divorce at several times throughout their marriage. They had difficulties because of their various personal and professional roles — wife, husband, bookkeeper, manager, supervisor. In his January 22, 2004 deposition, Jeffrey Rodgers stated he and the Debtor "had a terrible time working together." They began seriously discussing divorce in the summer of 2002 when the Internal Revenue Service began auditing them. Prior to the audit, the Debtor had been the business manager of Jeffrey Rodgers' veterinary practices. The audit, especially in light of the Debtor's role in the business prior to the audit, caused additional strain on their relationship, and she no longer wanted to be involved with Jeffrey Rodgers' business. Jeffrey

2

Rodgers hired a law firm to take over the bookkeeping duties from the Debtor, but she continued doing reception work for Jeffrey Rodgers until his veterinary clinic closed.

Michael McIntee was the attorney of record for both parties in the uncontested divorce. He was a friend of Jeffrey Rodgers, an acquaintance of the Debtor, and a client of the veterinary clinic. Attorney McIntee sent them a letter dated December 12, 2002, stating with regard to his understanding of the Rodgers' relationship:

> Jeff informed me that the two of you want to get divorced. It is not that the two of you really can't get along, it is just the fact that there is a great deal of debt against the clinics and Rhonda doesn't want to leave the clinic business with having that debt hanging over her.

Attorney McIntee drew up the divorce agreement, but he was not involved in determining the property distribution and child support obligation; the Debtor and Jeffrey Rodgers came to an agreement as to these issues on their own. Attorney McIntee did, however, advise Jeffrey Rodgers that the agreed child support obligation was more than he would owe under the child support guidelines.

As part of the divorce, Jeffrey Rodgers also agreed to provide health insurance coverage for their son and to pay for his uncovered medical expenses. Because Jeffrey Rodgers wanted their son to attend a Lutheran school, he agreed to pay for the private school expenses. He also agreed to provide medical insurance for the Debtor for 18 months. Finally, Jeffrey Rodgers received all of the assets and the debts of his businesses.

The Debtor received the marital home in Towner, North Dakota, and a fifth-wheel camper in the divorce, and she agreed to pay the remaining debts against them. She also received a 1999 Mercedes Benz owned by Jeffrey Rodgers' father. Jeffrey Rodgers testified he had intended to obtain

title to the vehicle and then transfer title to the Debtor, but she later decided she did not want the Mercedes—it could not be used to pull the camper and licensing and insuring it was very expensive. The Mercedes was returned to Jeffrey Rodgers' father, and the Debtor instead received a Ford F-250, a truck capable of pulling the camper. The F-250's engine blew up, but she has not asked Jeffrey Rodgers to provide her with another replacement vehicle.

Jeffrey Rodgers testified he thought the distribution of assets and debts in the divorce was fair because he was the sole proprietor of the businesses and the Debtor was not responsible for either the debts or the assets of the businesses.

After the divorce, Jeffrey Rodgers payed the Debtor a salary, and she continued to work for him until the veterinary clinic closed in September 2003. The clinic was in Minot, North Dakota, and had apartments both upstairs and downstairs. The upstairs apartment had four bedrooms, and the downstairs apartment had one bedroom. After the divorce, the Debtor stayed in one of the apartments when the roads were bad or if she worked late and then worked the following day. Although there were times when both she and Jeffrey Rodgers stayed at the clinic, she testified he was usually at the former marital home in Towner when she stayed at the clinic.

The Rodgers went to Las Vegas February 21-24, 2003 for the Western States Veterinary Conference, a continuing education conference, despite the pending divorce. Jeffrey Rodgers testified that the Debtor attended the conference notwithstanding the divorce because the tickets were already purchased and she still worked for him. The trip was planned many months in advance because of the popularity of the convention, which includes a large technology and product trade show that enables businesses to remain current with the latest products. Because the Debtor handled the

4

purchasing of products for the veterinary practices, it was practical for her to attend. Both the Debtor and Jeffrey Rodgers testified they did not share a hotel room during the conference.

Jeffrey Rodgers and their son hauled the camper to Nebraska for the Debtor after the divorce and left it at the Debtor's parent's home for her. She testified that she allows Jeffrey Rodgers to use the camper because their son very much enjoys spending time in it.

B.  The Veterinary Businesses

Jeffrey Rodgers owned and operated a number of sole proprietorship veterinary businesses over the years. After he graduated from veterinarian school, Jeffrey Rodgers began working for Dr. Perry Nermoe, a veterinarian in Towner for 20 years. He eventually bought Dr. Nermoe's practice, Towner Vet Service, and Dr. Nermoe then worked for him. Towner Vet Service closed December 2002.

During some of the same time period during which Jeffrey Rodgers owned and operated Towner Vet Service, he also manufactured equine dental tools and taught seminars as Dakota Vet Equipment in Garrison, North Dakota. The Rodgers moved their residence from Garrison to Towner in 1997, and Jeffrey Rodgers did not reestablish the business after the move.

Mountain View Vet Clinic was a veterinary practice the Debtor owned in Bottineau, North Dakota. In the summer of 2002, Jeffrey Rodgers' partner was in rehabilitation and he could not find a replacement veterinarian. Jeffrey Rodgers had to sell the practice, and the sale proceeds went to creditors.

C.  Jeffrey Rodgers' Parents

Ronald and Betty Rodgers, Jeffrey Rodgers' parents, live in Valentine, Nebraska, where they own a truck stop and convenience store. Their businesses include Rodgers Oil Company, Rodgers Oil Company Auto, and Rodco, Inc.

5

Over the years, Jeffrey Rodgers' parents loaned him substantial amounts of money. A promissory note dated June 16, 1996 memorializes a $90,000.00 loan from Ronald G. Rodgers d/b/a/ Rodgers Oil Co., Inc. to Jeffrey Rodgers at an 8% annual interest rate. He testified he used this loan for the initial purchase of his veterinary practice in 1996.

In approximately early 2003, Jeffrey Rodgers' father was receiving cancer treatments. Because of her father-in-law's health problems and the divorce of the Debtor and Jeffrey Rodgers', his parents asked him to grant them a mortgage against Animal Medical Center to memorialize the other money they had lent Jeffrey Rodgers over the years. The Debtor and Jeffrey Rodgers both signed a second mortgage in favor of Rodgers Oil Company in the amount of $446,102.22 on May 14, 2003. Jeffrey Rodgers testified they did not receive $446,102.22 when they signed the mortgage; instead, the mortgage was in exchange for money they had received in the past. The Debtor and Jeffrey Rodgers were divorced at the time, but the mortgage references them as "Husband and Wife." Jeffrey Rodgers testified that bankruptcy was not even a thought at the time he and the Debtor signed the second mortgage.

Jeffrey Rodgers also signed a handwritten document dated May 16, 2004, memorializing a $12,000.00 loan. He made informal payments to his parents on these debts, and he also worked for his parents as partial payment.

In March 2003, Jeffrey Rodgers sold an all-terrain vehicle on e-bay for Rodgers Oil Company Auto. The buyer made the $5,200.00 check payable to Jeffrey Rodgers although the seller was actually Rodgers Oil Company. Jeffrey Rodgers gave the check to his mother who deposited it into the his personal account rather than the Rodgers Oil Company Auto account. Jeffrey Rodgers

6

realized the mistake when he saw the deposit on his bank statement, and he called his mother and told her of the mistake.

Betty Rodgers testified she inadvertently deposited the check into the wrong account, and her husband and son both caught the error. To remedy the mistake, she took $5,000.00 out of his account and made a $5,000.00 certificate of deposit for her grandson, the son of the Debtor and Jeffrey Rodgers, on June 6, 2003. She testified that she withdrew $200.00 less than the amount of the erroneous deposit as the her son's commission for selling the vehicle for Rodgers Oil Company Auto.

D.   Job Hunting in Nebraska

In September 2003, after both the divorce and the closing of Animal Medical Center, the Debtor was in Nebraska visiting her family. Jeffrey Rodgers asked her to contact a few veterinary clinics on his behalf to inquire about job openings. She visited Wachal Pet Health Center and spoke with Dr. Dean Frey about a position for his. Dr. Frey testified by deposition that the Debtor told him "she was in town looking for employment for herself between Lincoln and Omaha, and that she was checking out veterinary employment for her husband Jeff." The Debtor also spoke with Mary Miller-Kumpost of Superior Veterinary Clinic about a veterinary position open at the clinic, and Jeffrey Rodgers later interviewed for the position. Miller-Kumpost testified by deposition that neither the Debtor nor Jeffrey Rodgers gave her the impression they were divorced.

E.   MWI

Ron Schmitz, a sales representative for MWI since December 1999, testified at trial. Schmitz communicated primarily with the Debtor on his routine sales calls to the veterinary clinic. He spoke with her about new products, accounts receivable, and the like. He testified that Jeffrey Rodgers'

7

business would occasionally had problems making timely payments, but the account would be brought current whenever he mentioned it. In February 2002, however, the account was not brought current, and a large balance was owing. Schmitz spoke to the Debtor, and she told him they had significant accounts receivable from fall business and that they would pay MWI when the money came in. At the end of May, Schmitz told her all future sales would be cash on delivery only. Schmitz explained that MWI continued to sell product on credit until that time because of the their history of always bringing the account current.

Jeffrey Rodgers testified that he knew the debt to MWI was large—in fact the debt was more than $200,000.00 in May 2002—so he asked MWI to take all of its product back because he was unable to pay the debt. Schmitz retrieved portions of MWI's product on several occasions in June and July 2002 but left much of the product behind, including several very costly items. Schmitz said he took back as much product as MWI could resell, and MWI credited their account for the retrieved product. Jeffrey Rodgers testified he sold some of the remaining product that MWI refused to take back and continued to pay MWI. He said he knew the clinic might close, and he wanted to pay off the debt.

MWI introduced into evidence the credit applications submitted to it by Jordahl Animal Clinic, Towner Vet Service, and Mountain View Vet Hospital. The applications are single-page documents and do not require the applicant to provide any financial information. Schmitz testified that completion of the application was the extent of the financial information gathered by MWI before extending credit. He also stated that MWI did not rely on the marital status of the Debtor and Jeffrey Rodgers in extending credit.

The parties stipulated that the clinic purchased veterinary supplies and materials from MWI from April 8, 2002 to January 24, 2003 in the amount of $72,638.84. MWI's claims against the Debtor arise out of this amount still owing.

MWI introduced into evidence a commercial financing statement prepared by Western State Bank - Towner and signed by the Debtor and Jeffrey Rodgers on June 27, 2000, listing their net worth at $904,618.00. The financing statement does not include any debts owed to Rodgers Oil Company or Jeffrey Rodgers' parents. When questioned about the disposition of livestock included on the financing statement but not on the his bankruptcy schedules, Jeffrey Rodgers explained that the livestock was sold prior to his bankruptcy.

MWI also introduced into evidence a balance sheet prepared by Western State Bank - Towner and signed by the Debtor and Jeffrey Rodgers for purposes of obtaining credit on September 30, 2002. Jeffrey Rodgers made hand-written corrections and comments to the balance sheet schedules, such that it indicates $13,488.00 in cash but includes a question mark as to the accuracy of that figure. It further indicates accounts receivable of $21,000.00; inventory and receivables of $86,000.00; not readily marketable bonds of $35,300.00; other intermediate assets of $115,850.00; and real estate and land of $400,000.00. Jeffrey Rodgers crossed out several items of machinery, equipment and vehicles, and he also noted items that were leased rather than owned and items in the possession of Dr. Nermoe. He explained that many of the vehicles included on the balance sheet had been either taken back by Rodgers Oil Company Auto or sold by him at auction on behalf of Rodgers Oil Company Auto. Others had gone back to the bank.

AO 72A
(Rev.8/82)

F.   Bankruptcy

The Debtor filed a voluntary Chapter 7 petition for bankruptcy relief on November 14, 2003. She testified that at the time of the divorce, she had no intention of filing bankruptcy; rather, MWI's efforts to collect from her on the business obligations led her to bankruptcy. She listed MWI as an unsecured creditor owed $77,777.87 on Schedule F of the petition.

Jeffrey Rodgers testified that at the time of the divorce, he was unaware of the extent of his businesses' financial problems. After the IRS began its audit, he hired a tax attorney who eventually identified several financial problems with the businesses. He began considering bankruptcy only after he was advised of the gravity of his financial situation by the tax attorney.

G.   Present Circumstances

At the time of trial, the Debtor was living in Lincoln, Nebraska, with her sister and parents. She managed a warehouse for Butler Veterinary Supply Company of Omaha, Nebraska, from November 4, 2003 through its closure at the end of July 2004. She testified she did not have any job prospects after the closure of the warehouse, but that she planned to remain in Nebraska.

Jeffrey Rodgers currently lives in Valentine, Nebraska. Although he stipulated prior to trial that he is currently employed by Rohrig Animal Hospital in Omaha, Nebraska, he testified at trial that he had been unemployed for the previous month and a half. He worked at Rohrig Animal Hospital for five months prior to his resignation, earning $66,000.00 annually plus a bonus of approximately $3,500.00.

II. CONCLUSIONS OF LAW

MWI argues for both the general denial of a bankruptcy discharge to the Debtor and a determination of nondischargeability of the specific obligation owed to MWI.

10

A.      11 U.S.C. § 727(a)

MWI seeks to have the Debtor denied a discharge under 11 U.S.C. § 727(a)(2). Section 727(a) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

\* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a).

Denying a debtor a discharge is a drastic remedy. See In re McLaren, 236 B.R. 882, 893 (Bankr. D.N.D. 1999). In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party, with the burden of proof thereunder resting squarely upon the latter. See id. The standard of proof is a preponderance of the evidence. See id.

1. Section 727(a)(2)(A)

MWI argues the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2) because she transferred, removed and/or concealed property with an intent to hinder, delay, or defraud MWI. Specifically, MWI cites the transfer of assets in the divorce, the transfer of other assets, and the transfer to Jeffrey Rodgers' parents a second mortgage and other security as the factual bases for its claim.

11

> The elements essential to barring a discharge under section 727(a)(2)(A) are:
>
> (1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

Kaler v. Craig (In re Craig), 195 B.R. 443, 449 (Bankr. D.N.D. 1996). The dispute in this case primarily involves the last element.

An intent to defraud can be established by circumstantial evidence or from inferences drawn from a debtor's course of conduct. See id. at 450. Courts have considered several factors in determining whether a debtor acted with actual intent to hinder, delay or defraud: (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry. Riley v. Riley (In re Riley), 305 B.R. 873, 878-79 (Bankr. W.D. Mo. 2004).

First, MWI asserts the Debtor knew MWI would be substantially certain to suffer harm because of the inequitable distribution of debts and assets in the divorce. In short, MWI asserts the divorce was a "sham" to defraud MWI. More specifically, MWI asserts the Debtor and Jeffrey Rodgers conspired to defraud MWI by divorcing and agreeing to distribute all of their debt to Jeffrey Rodgers and all of their equity to the Debtor, whereupon Jeffrey Rodgers would file bankruptcy and

12

discharge the unsecured debt to MWI. In support of this contention, MWI cites specific examples of the Debtor's course of conduct: acquiescing to a distribution in the divorce of most of the assets and few of the debts; going to Las Vegas for a veterinary convention with Jeffrey Rodgers days before their divorce was final; allowing Jeffrey Rodgers to continue to use assets—such as the camper—that had been transferred to him in the divorce; working for Jeffrey Rodgers after the divorce; staying in the same apartment as Jeffrey Rodgers after the divorce; and referring to Jeffrey Rodgers as her husband after the divorce.

The Court is simply not convinced the divorce was a "sham." Jeffrey Rodgers explained that he considered the property distribution fair because the business debts and assets were his not hers. He agreed to pay for private school for their son because such was his desire not hers. The divorce decree is undeniably bona fide, and the Court is less cynical than MWI about the post-divorce relationship between the Debtor and Jeffrey Rodgers. The Court does not find the Debtor's references to her former spouse as her husband and similar references by Jeffrey Rodgers to the Debtor as his wife indicative of a fraudulent divorce. Instead, the Court deems the references more likely indicative of inadvertence—given the recency of the divorce—and convenience and deems their civility and cooperation commendable rather than indicative of fraud. The dynamics of relationships between former spouses are as varied as the reasons for divorce, and the Court finds neither their reasons for the divorce nor their subsequent amicability unreasonable, much less intentionally fraudulent. The Debtor and Jeffrey Rodgers provided ample explanation, and context, for their conduct.

MWI further uses a comparison of Jeffrey Rodgers' bankruptcy schedules to a financing statement and balance sheet prepared by a bank to the evidence the "mysterious disappearance" of

13

assets of the Debtor. The Court, however, is unconvinced and concludes Jeffrey Rodgers provided reasonable explanations for the disposition of the assets. In fact, he explained that many of the assets should not have been included in the financial documents in the first instance because they were assets of Rodgers Oil Company Auto, not the Debtor or him. The financial documents may not be a model of accuracy, and perhaps the Debtor should have been more vigilant about their accuracy prior to signing them, but the documents offer little in the way of support for the contention that the Debtor intended to defraud MWI. Jeffrey Rodgers allowed some of the assets, such as Towner Vet Service, to return to the title holder, and he sold other assets and remitted the proceeds to Western State Bank.

MWI lastly suggests that granting Jeffrey Rodgers' parents a second mortgage and other security is indicative of the Debtor's intent to defraud MWI. Jeffrey Rodgers testified that his parents had loaned him significant amounts of money over the years. Although his testimony and other evidence of the loans could have been more specific, the preponderance of the evidence is that such loans were indeed made. Other circumstances surrounding the transactions include that his father was receiving cancer treatments and the Debtor and he were recently divorced. Under these circumstances, it was reasonable both for his parents to have sought to memorialize their previously informal agreements and for the Debtor and Jeffrey Rodgers to have complied.

For these reasons, the Court finds that MWI failed to prove by a preponderance of the evidence that the Debtor intended to defraud MWI, and therefore, section 727(a)(2) cannot serve as a basis for denial of discharge in this case.

AO 72A
(Rev.8/82)

B.  11 U.S.C. § 523(a)

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002). Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993). The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991).

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In this context, the term willful means deliberate or intentional. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Hobson Mould Works, Inc. v. Madsen (In re Madsen), 195 F.3d 988, 989 (8th Cir. 1999). The injury, and not merely the act leading to the injury, must be deliberate or intentional. Geiger, 523 U.S. at 61-62. Malice requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm. Madsen, 195 F.3d at 989. Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies. The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent some additional aggravated circumstances. Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003). Conduct which is certain or almost certain to cause financial harm to the creditor is required. Id.

MWI argues the Debtor's obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) because the "sham divorce" between the Debtor and Jeffrey Rodgers, as well as the Debtor's other

15

conduct discussed above, was willfully and maliciously intended by the Debtor to preclude MWI from payment of the amount owed.

As discussed above, the Court is not convinced the divorce was a "sham." The Court likewise is not convinced the Debtor willfully or maliciously injured MWI. Jeffrey Rodgers informed MWI to retrieve its product because they was unable to pay the debt. He wanted MWI to retrieve all of its product, which they did not do, and they even sold some of the remaining product MWI refused to take back and continued to pay MWI. Jeffrey Rodgers knew the clinic might close, and he wanted to pay off the debt. This conduct is demonstrative of good faith, not malice, and these actions in furtherance of MWI's restoration are wholly inconsistent with willfully injuring MWI. MWI failed to prove by a preponderance of the evidence that the Debtor willfully and maliciously injured MWI, and therefore, the debt does not fall within the exception to discharge provided under section 523(a)(6).

Based on the foregoing, the Complaint of Plaintiff MWI Veterinary Supply Co. based on sections 548 and 727 of the Bankruptcy Code is DISMISSED.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this August 13th, 2004.

Notice of Entry
Under F.R.B.P. 9022 (a)
FILED
AUG 1 3 2004
Clerk
U.S. Bankruptcy Court
District of North Dakota

WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT

Copies served by facsimile to:   Henry Eslinger (Richard Farroh), Defendant's Aty.
                                 Mark Hanson, Plaintiff's Aty.
Copy served electronically to:   U.S. Trustee

16

AO 72A
(Rev.8/82)